## COMMONWEALTH *vs.* ANTONINO CIARAMITARO.

No. 99-P-1954.

Middlesex. March 5, 2001. - May 23, 2001.

Present: BROWN, RAPOZA, & GRASSO, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Automobile, Threshold police inquiry, Plain view, Protective frisk.

At the trial of indictments for trafficking in cocaine and possession of danger-ous weapons, the judge correctly denied the defendant's motion to sup-press evidence seized from his motor vehicle, after a warrantless search, where the record demonstrated that police officers were warranted in stop-ping the defendant's vehicle after observing him make an illegal turn and drive erratically [642-643]; that the officers' actions were reasonable in time, space, and the degree of force employed [643-644]; that the officers' plain-view observations provided probable cause to arrest the defendant for illegal possession of a dangerous weapon, and probable cause to search the entire vehicle for weapons, thus justifying the discovery and plain-view seizure of cocaine in the course of searching for the weapons [644-646]; and that the defendant's actions justified a protective frisk of the defendant leading to discovery of a digital scale [646]. BROWN, J., concurring.

INDICTMENTS found and returned in the Superior Court Depart-ment on August 28, 1996.

A motion to suppress evidence was heard by R. Malcolm Graham, J., and the cases were heard by *Maria I. Lopez*, J.

*Michael A. Cioffi* for the defendant.

*Sheryl F. Grant*, Assistant District Attorney, for the Commonwealth.

GRASSO, J. Following a jury-waived trial, a Superior Court judge found the defendant guilty of trafficking in cocaine[1] and possession of two dangerous weapons: a dirk knife and a switch

---

[1] The cocaine had a net weight of between fourteen and twenty-eight grams. See G. L. c. 94C, § 32E(*b*)(1).

knife.[2] On appeal, the defendant challenges only the denial, after an evidentiary hearing, of his motion to suppress evidence (weapons and drugs) seized from his vehicle without a warrant. We affirm.

We summarize the facts found by the motion judge, which we supplement with uncontested testimony from the suppression hearing, *Commonwealth* v. *Sweezey*, 50 Mass. App. Ct. 48, 49 (2000), mindful that assessment of witness credibility is the province of the motion judge. See *Commonwealth* v. *Gutierrez*, 26 Mass. App. Ct. 42, 47 (1988).[3] At about 10:50 P.M. on June 20, 1996, Officer Michael O'Connell of the Wakefield police department was traveling westbound on Lowell Street in a marked cruiser. Nearing the intersection of Lowell and Main Streets, he observed a Mercury Marquis making an unusual, although not illegal, right turn onto Lowell Street (vehicles normally turned left from that position) heading in the direction of Officer O'Connell's cruiser. It appeared to Officer O'Connell that, in making the turn, the operator had driven very close to, or over, the curb. The vehicle pulled quickly to the right, stopped at the curb, and then resumed motion.

Officer O'Connell pulled into a parking lot and positioned his cruiser perpendicular to vehicles passing on Lowell Street. He saw the Mercury stop briefly at the curb a second time. Another vehicle approached the Mercury from the rear, and both vehicles passed in front of the cruiser. Officer O'Connell saw that the Mercury contained a lone male, later identified as the defendant. Officer O'Connell pulled his cruiser behind the second vehicle and followed as the third car in line. At the intersection of Lowell and Main Streets, for no reason apparent to Officer O'Connell, the Mercury stopped briefly for a third time in the "right turn only" lane, causing the vehicle immediately behind, and the cruiser, to stop.

The Mercury then made a sudden, and illegal, left turn across

---

[2]See G. L. c. 269, § 10(*b*).

[3]"In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). "[W]e accord deference to the judge's legal conclusions, keeping in mind that issues of constitutional dimension are reserved to the reviewing court for final decision." *Commonwealth* v. *Clermy*, 421 Mass. 325, 328 (1995).

Lowell Street into an Exxon gas station. Officer O'Connell followed and parked his cruiser a short distance behind. He did not activate the cruiser's blue lights, but his headlights were on.

As Officer O'Connell was calling the Wakefield police station to report the vehicle's plate number and his location, the defendant got out of the Mercury and approached the cruiser. Officer O'Connell left his cruiser and met the defendant halfway. The defendant began speaking in a heavy Italian accent that Officer O'Connell had difficulty understanding. Although the defendant's command of English was reasonable, he was not making coherent statements. He also appeared nervous.

Eventually, Officer O'Connell understood the defendant to be suggesting that he was lost. This struck Officer O'Connell as peculiar because the defendant said he lived in Wakefield. Officer O'Connell requested, and the defendant produced, his driver's license. Officer O'Connell was concerned enough about the defendant's behavior that he did not ask the defendant to return to his car for the registration. Officer O'Connell instructed the defendant to return to his car and remain there.

Officer O'Connell returned to the cruiser to check on the defendant's license status and any outstanding warrants. As Officer O'Connell reached for his radio, the defendant again got out of his vehicle. Once again, Officer O'Connell left his cruiser to intercept the defendant. This time, the defendant gave him the vehicle registration. After instructing the defendant to return to his vehicle and remain there, Officer O'Connell returned to his cruiser to radio the information to the station. As he did so, Officer O'Connell observed the defendant moving in the driver's seat, twisting and rotating his shoulders, and leaning side to side. He could not see the defendant's hands. These actions were not continuous, but they went on for a minute or two. In addition, the brake lights of the Mercury flashed on and off two or three times.

Shortly thereafter, Inspectors Austin and Moccia, dressed in civilian clothes, arrived in an unmarked backup unit, having been dispatched per the practice of the Wakefield police

department.[4] Officer O'Connell briefed them on the erratic operation of the defendant's vehicle[5] and his furtive movements. As the three officers talked, the defendant left his vehicle a third time and asked what was going on. Inspector Moccia told the defendant that they were running a registry check of his license. The information had not been received back at the time.

During this conversation, the defendant reached into the pocket of his leather jacket and began fumbling with an object. Officer O'Connell asked the defendant to take his hand out of his pocket. Inspector Moccia[6] and Officer O'Connell performed a pat frisk of the defendant's coat in the area where his hand had been. Inspector Moccia felt a small hard object; he reached in and retrieved a digital scale. Inspector Moccia asked what the scale was for, to which the defendant replied that he used it in his jewelry business.

After the pat frisk, Officer O'Connell remained with the defendant and continued to converse about his driving, while Inspectors Austin and Moccia walked over to the Mercury. From a position outside the passenger side of the vehicle, Inspector Moccia illuminated the interior with the aid of a flashlight. In the open glove compartment, Inspector Moccia observed a dirk knife, which he knew to be a dangerous weapon prohibited by G. L. c. 269, § 10. Inspector Moccia opened the passenger door, reached in, and retrieved the knife. He showed it to Inspector Austin, who had approached the driver's side. From outside the open driver's door, Inspector Austin used his flashlight to examine the floor of the vehicle. He noticed a wooden-handled object protruding from under the driver's seat; he recognized it to be a prohibited switch knife. Inspector Austin reached into the vehicle, confiscated the weapon, and showed it to Inspector Moccia.

After Inspector Austin discovered the second weapon, Inspec-

---

[4]They arrived within five minutes of the defendant's having entered the gas station.

[5]One of Officer O'Connell's concerns based upon his observations of the vehicle's operation was that the operator might be under the influence of alcohol or drugs.

[6]In light of Officer O'Connell's report of the defendant's movements, Inspector Moccia was concerned that the defendant might be in possession of a handgun in his pocket.

tor Moccia focused his flashlight on the interior of the vehicle. From outside the driver's side door he observed the corner of a glassine plastic bag sticking out of the "zippered portion" of the center arm rest which was in the "up" position. Inspector Moccia entered the vehicle and, on closer inspection, determined that the glassine bag contained a white powder that appeared to be cocaine.[7] He seized the bag and placed the defendant under arrest.

This case illustrates that analysis of events in motor vehicle stops is not only fact intensive and time dependent, *Commonwealth* v. *Torres*, 424 Mass. 153, 163 n.8 (1997), but also interconnected and dynamic: observations made, and events occurring, during the stop often lead to heightened suspicion (justifying further inquiry), or to probable cause, or to plain-view seizures. *Commonwealth* v. *Kitchings*, 40 Mass. App. Ct. 591 (1996). Here, a motor vehicle infraction, *Commonwealth* v. *Santana*, 420 Mass. 205, 207 (1995), and other observations creating reasonable suspicion that the operator might be under the influence of drugs or alcohol, *Commonwealth* v. *Smigliano*, 427 Mass. 490, 492 (1998), justified a proportional detention, *Commonwealth* v. *Laaman*, 25 Mass. App. Ct. 354, 364 (1988). Prolonged by the defendant's conduct, the detention led to a plain-view observation of contraband weapons,[8] *Commonwealth* v. *Doulette*, 414 Mass. 653, 655 (1993), which, in turn, provided probable cause to arrest the defendant and to search his motor vehicle for additional weapons, *Commonwealth* v. *Moses*, 408 Mass. 136, 145 (1990). In the course of that weapons search, a plain- view seizure of a significant quantity of a controlled substance occurred. In light of all these circumstances, there was no error in denying the defendant's motion to suppress.

1. *Constitutionality of the stop.* Analysis begins with the

---

[7]Testing confirmed that the bag included eight smaller bags containing 17.27 grams of cocaine.

[8]The digital scale discovered during the pat frisk neither enhanced any reasonable suspicion of criminal activity, nor assumed any evidentiary significance until the later discovery of the cocaine. Because the pat frisk was justified, as discussed *infra*, we need not consider whether the doctrine of inevitable discovery would provide an independent basis for denying suppression of the scale. See *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 n.4 (1989). Compare *Commonwealth* v. *Miller*, 42 Mass. App. Ct. 703, 707 n.3 (1997).

familiar principle that "[w]here the police have observed a traffic violation, they are warranted in stopping a vehicle." *Commonwealth* v. *Santana*, 420 Mass. at 207, quoting from *Commonwealth* v. *Bacon*, 381 Mass. 642, 644 (1980). Here, Officer O'Connell observed the defendant make an illegal left turn into the Exxon station.[9] Observed indicia of erratic operation (pulling onto the roadway out or over the curb, pulling to the curb three times for short periods, stopping in the roadway for no apparent reason, and making a sudden illegal turn) also raised a reasonable suspicion that the defendant may have been operating under the influence of alcohol or drugs. That Officer O'Connell (or later Inspectors Moccia or Austin) may have harbored other unarticulated suspicions does not alter the analysis. See *Commonwealth* v. *Santana*, 420 Mass. at 207-209 (Massachusetts follows the "authorization" rather than the "pretext" approach). Neither does it matter that the defendant was never cited for the civil motor vehicle infraction. See *Commonwealth* v. *Moscat*, 49 Mass. App. Ct. 622, 624 (2000) ("police may handle [a] situation without making an arrest if they so choose"). See also *Cambridge* v. *Phillips*, 415 Mass. 126, 129 n.3 (1993).

2. *Permissible scope of the stop.* The nature of the stop defines the scope of the initial inquiry. See *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. 468, 470-471 (1996). The investigative detention must be temporary and last no longer than reasonably necessary to effectuate the purpose of the stop. See *Commonwealth* v. *Laaman*, 25 Mass. App. Ct. at 364. Here, there were two distinct, but interrelated, bases of reasonable suspicion: a civil motor vehicle infraction and possible operation under the influence of drugs or alcohol. The observed motor vehicle infraction entitled Officer O'Connell to inquire about the

---

[9]The defendant pulled into the gas station on his own, without blue lights or siren or other "show of authority" factors. Contrast *Commonwealth* v. *Smigliano*, 427 Mass. at 492 (activating blue lights constitutes a seizure requiring some level of justification). The "stop" in the constitutional sense occurred when Officer O'Connell requested that the defendant produce his driver's license. Compare *Commonwealth* v. *Murdough*, 428 Mass. 760, 764 (1999) ("[t]he point at which a constitutional question first arose . . . was when the defendant was told to get out of his vehicle"); *Commonwealth* v. *Eckert*, 431 Mass. 591, 595-596 (2000).

defendant's license status and vehicle registration, and to confirm their validity. See *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. at 470-471. This basis for the defendant's detention would end with confirmation that the defendant's license was valid and the registration was in order. *Ibid.* See *Commonwealth* v. *Laaman*, 25 Mass. App. Ct. at 363-364.

Here, however, the defendant's behavior enhanced Officer O'Connell's reasonable suspicion. Besides speaking excitedly and unintelligibly, the defendant did not follow directions, repeatedly getting out of his vehicle. This conduct prolonged Officer O'Connell's efforts to confirm the validity of the defendant's driver's license and registration and lengthened the defendant's detention.[10] See *Commonwealth* v. *Robles*, 48 Mass. App. Ct. 490, 493-494 & n.2 (2000). The results of the license and registration query had not been determined in the few minutes prior to the plain view observation of the illegal weapons. *Ibid.* As such, continued detention of the defendant was permissible. Contrast *Commonwealth* v. *Torres*, 424 Mass. 153, 163 (1997) (continued detention of an operator and passenger after the operator had satisfied the purpose of the stop by producing his license and registration was impermissible).

The police actions were reasonable in time, space, and the degree of force employed. See *Commonwealth* v. *Willis*, 415 Mass. 814, 819-820 (1993). See also *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985) (principal of proportionality considers the degree of intrusion upon the defendant and the level of suspicion prompting the intrusion). No pat frisk occurred until the defendant fumbled in his jacket pocket and furtive movements had been noted.

3. *Plain-view observation of illegal weapons and search of the motor vehicle.* An officer making a stop for a traffic violation is not required to ignore what he sees, smells or hears. *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. at 471. Neither Inspector Moccia's nor Austin's observations of illegal weapons was a search in the constitutional sense. See *Commonwealth* v. *Garcia*, 34 Mass. App. Ct. at 649. Their respective observa-

---

[10]The defendant's furtive movements in the vehicle also heightened Officer O'Connell's suspicions, leading to a permissible pat frisk for safety as discussed *infra.*

tions, from a vantage outside the vehicle in a gas station open to the public, intruded on no reasonable expectation of privacy of the defendant. See *Commonwealth* v. *Doulette*, 414 Mass. at 655. These plain-view observations provided probable cause to arrest the defendant for illegal possession of a dangerous weapon, *Commonwealth* v. *Williams*, 422 Mass. 111, 119 n.11 (1996),[11] and probable cause to search the entire motor vehicle, *Commonwealth* v. *Motta*, 424 Mass. 117, 122-124 (1997), as well as its compartments (including the center console), for weapons. See *Commonwealth* v. *Cast*, 407 Mass. 891, 906-908 (1990); *Commonwealth* v. *Wunder*, 407 Mass. 909, 913-915 (1990) (concluding that if there is probable cause to search a vehicle, then authority under art. 14 of the Massachusetts Declaration of Rights extends to all containers, open or closed, found within). See also *California* v. *Acevedo*, 500 U.S. 565, 579-580 (1991) (under the Fourth Amendment to the United States Constitution, a lawful warrantless search of a motor vehicle extends to all containers, open or closed, found within). Thus, Officer O'Connell's discovery and plain-view seizure of the cocaine in the course of searching for weapons was justified. See *Commonwealth* v. *Moses*, 408 Mass. at 145 & n.8; *Commonwealth* v. *Santana*, 420 Mass. at 211.

Having decided that the search of the defendant's vehicle was justified as a motor vehicle search based upon probable

---

[11]A plain-view *observation* is not a search in the constitutional sense; it requires neither a warrant, nor an exception to the warrant requirement. See *Commonwealth* v. *Garcia*, 34 Mass. App. Ct. at 649. In contrast, a plain-view *seizure*, which involves a seizure but not a search, is an exception to the warrant requirement requiring justification. "Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Commonwealth* v. *Santana*, 420 Mass. at 211, quoting from *Minnesota* v. *Dickerson*, 508 U.S. 366, 375 (1993).

Because neither Inspector Moccia nor Inspector Austin was entitled to be inside the vehicle when the weapons were first observed, there was no lawful right of access justifying a plain- view seizure. However, seizure of the weapons was justified under the motor vehicle exception to the warrant requirement. *Commonwealth* v. *Motta*, 424 Mass. 117, 124 (1997) (warrantless search of an automobile based upon probable cause without exigent circumstances is permitted under art. 14 of the Massachusetts Declaration of Rights).

cause, we need not consider, as the motion judge did, whether such search also might have been justified as a search incident to a lawful arrest.[12] As the defendant does not argue in his brief that the search violated G. L. c. 276, § 1, he has waived any issue as to the applicability of the statute in the circumstances. See *Commonwealth* v. *Brillante*, 399 Mass. 152, 155 n.6 (1987).[13]

4. *The pat frisk.* We comment briefly on the pat frisk leading to discovery of a digital scale. The defendant's actions justified a protective frisk. The frisk was not investigatory, but protective, allowing the police to pursue their investigation without fear of possible violence. The defendant's furtive gestures, *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 106 (1997), in conjunction with his other behavior, *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 314-315 (1992), created the requisite reasonable apprehension that the officers might be in danger, justifying the pat frisk of the defendant's person.[14] See *Commonwealth* v. *Johnson*, 413 Mass. 598, 600-601 (1992).

---

[12]Under a search incident to a lawful arrest analysis, once the police possessed probable cause to arrest the defendant for illegal weapons, they were entitled to search the immediate area, including his motor vehicle, for other evidence of the crime, such as other weapons. See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 351 (1983); *Commonwealth* v. *Madera*, 402 Mass. 156, 160 (1988) (art. 14 permits search incident to arrest of a closed container if police have reason to believe it might hold a weapon or evidence of a crime). See also *New York* v. *Belton*, 453 U.S. 454, 462 & n.6 (1982) (expressly disclaiming reliance on the automobile exception to the Fourth Amendment). The search may precede the formal arrest provided that probable cause to arrest exists at the time the search is made, independent of the results of the search. See *Commonwealth* v. *Johnson*, 413 Mass. 598, 602 (1992); *Commonwealth* v. *Clermy*, 421 Mass. 325, 330 (1995).

[13]General Laws c. 276, § 1, 2d par., as inserted by St. 1974, c. 508, provides, "A search conducted incident to an arrest may be made only for the purposes of seizing fruits, instrumentalities, contraband and other evidence of the crime for which the arrest has been made, in order to prevent its destruction and concealment; and removing any weapons that the arrestee might use to resist arrest or effect his escape. Property seized as a result of a search in violation of the provisions of this paragraph shall not be admissible in evidence in criminal proceedings." We note that this statutory limitation would not appear to aid the defendant. *Commonwealth* v. *Beasley*, 13 Mass. App. Ct. 62, 64 (1982).

[14]"A police officer does not have to testify specifically that he was in fear of his own safety so long as it is clear that he was aware of specific facts . . .

We conclude that the motion judge did not err in denying the defendant's motion to suppress.

*Judgments affirmed.*


BROWN, J. (concurring). I concur with the majority, but would reach the result on a slightly different basis. At the outset, I am compelled to say that the testimony of the officers strains credulity; their visual acuity compares favorably to that of Superman. From their testimony, the fact finder is asked to believe that, although the defendant had abundant time to secrete the contraband, he instead left the drugs and two weapons in "plain view" in three different locations within his automobile. It is now clear to me why "they call it dope."

My analysis would start at the moment Inspector Moccia discovered the illegal dirk knife in plain view. That was an arrestable offense and justified the search of the passenger area as incident to a lawful arrest. See note 12, *supra.* This analysis allows me to ground my decision on either the serendipity of the police or the carelessness of the defendant.

---

warrant[ing] a reasonable person to believe he was in danger." See *Commonwealth* v. *Va Meng Joe*, 425 Mass. at 102 n.7.